UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

In re:                                          Chapter 11

Tristar Fire Protection, Inc.,                  Case No. 11-62283

        Debtor.                                 Hon. Phillip J. Shefferly
_____/

**OPINION (1) DENYING MOTION FOR ALLOWANCE AND PAYMENT OF
ADMINISTRATIVE EXPENSE CLAIM; AND (2) ESTIMATING ADMINISTRATIVE
EXPENSE CLAIM FOR PURPOSES OF CHAPTER 11 CONFIRMATION HEARING**

### INTRODUCTION

This is a Chapter 11 case. The Debtor is in the business of providing sprinkler design,

installation and repair services for new construction and existing buildings. The Debtor filed a plan

of reorganization. A labor union, Sprinkler Fitters' Local 704, filed an objection. Among other

things, the objection states that Local 704 holds an administrative expense claim arising out of

certain alleged unfair labor practices by the Debtor that occurred after the Debtor filed its Chapter 11

case. Local 704 objects to the Debtor's plan because it does not provide for payment of this

administrative expense claim. Local 704 also filed a separate motion for allowance and payment

of this administrative expense claim. Because the Debtor does not believe that Local 704 holds an

administrative expense claim, the Debtor requests that the Court deny Local 704's motion and

overrule its objection to the Debtor's plan. For the reasons explained in this opinion, the Court

denies Local 704's motion for allowance and payment of an administrative expense claim. Further,

the Court estimates Local 704's administrative expense claim at zero for purposes of considering

its objection to the Debtor's plan of reorganization.

## JURISDICTION

This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) and (L), over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a).

## PROCEDURAL HISTORY

On August 18, 2011, the Debtor filed this Chapter 11 case. On October 11, 2011, the Debtor filed a combined plan of reorganization and disclosure statement. The Court set a deadline of December 2, 2011 to file objections to the plan and disclosure statement, and scheduled a hearing on confirmation of the plan of reorganization on December 9, 2011.

Several parties timely filed objections to confirmation of the Debtor's plan, including the objection filed by Local 704 (docket entry no. 83). One of the issues raised by Local 704's objection pertains to a provision in the Debtor's plan for an "Administrative Claim Escrow" to fund the payment of administrative expense claims. Local 704 asserts that it holds an administrative expense claim in this case because of alleged unfair labor practices by the Debtor during the Chapter 11 case. According to Local 704, the Debtor's post-petition unfair labor practices entitle Local 704 to an award of back pay and fringe benefit contributions for its members who were employed by the Debtor. Local 704 argues that the Debtor's plan cannot be confirmed unless the plan provides sufficient funds to pay its administrative expense claim. Although the Debtor denies that Local 704 is entitled to an administrative expense claim, the Debtor requested that the Court adjourn the confirmation hearing to permit the Debtor to try to resolve all of the outstanding objections to its plan, including Local 704's objection. The Court granted that request. The Court also ordered the appointment of a mediator for all objections and adjourned the confirmation hearing until January 5, 2012.

-2-

At the adjourned confirmation hearing, the Debtor informed the Court that the mediator was successful in resolving a number of outstanding issues for confirmation, but Local 704's objection was still outstanding. In the meanwhile, after the original confirmation hearing but before the adjourned confirmation hearing, Local 704 filed on December 20, 2011 a "Request for Payment of Chapter 11 Administrative Claims" (docket entry no. 97). This "request" alleges that Local 704 holds an administrative expense claim of $545,600.00. The request also states that Local 704 intends to file a "Motion for payment of administrative claim . . . at the appropriate time." This created a problem for the Debtor because one of the requirements for confirmation is that administrative expense claims be paid in full on the effective date of the plan unless the holder of the claim agrees to some other treatment. At the adjourned confirmation hearing, the Debtor continued to deny that Local 704 is entitled to allowance of any administrative expense claim, but also explained that it does not have funds to pay any administrative expense claim that may be allowed for Local 704. Because the Debtor has the burden as the plan proponent to show that all of the elements of § 1129 of the Bankruptcy Code are met with respect to its plan, it became apparent to the Court that Local 704's request for allowance of an administrative expense claim must be resolved before proceeding further with confirmation of the Debtor's plan.

In an effort to expedite resolution of the dispute between Local 704 and the Debtor, the Court determined, with the consent of both parties, to treat Local 704's "Request for Payment of Chapter 11 Administrative Claims" as a motion for allowance and payment of an administrative expense claim, rather than require Local 704 to file a separate motion. The Court then fixed a deadline for Local 704 to file a memorandum of law in support of its motion and for the Debtor to

file a response to it.  The Court scheduled an evidentiary hearing on the motion for February 8, 2012, and adjourned the confirmation hearing until after that date.

Local 704 called one witness at the evidentiary hearing, Greg Herman, its business manager, financial secretary and treasurer.  The Debtor called two witnesses.  One witness was Scott Penive, the former president of the Debtor.  The other witness was Eric Wieber, the chief financial officer of the Debtor.  Local 704 and the Debtor stipulated to admit into evidence Local 704's exhibits A through J and the Debtor's exhibits 101 through 137.  After Local 704's proofs, the Debtor made an oral motion for judgment in its favor.  The Debtor also filed a memorandum of law in support of that motion.  The Court took the Debtor's motion under advisement.  At the conclusion of the hearing, Local 704 requested an opportunity to reply in writing to the motion.  The Court granted that request.  All issues with respect to the hearing are now fully briefed.  The following are the Court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052.

## FACTS

The Debtor has been in the business of providing sprinkler design, installation and material services since 1978.  The Debtor's business operates out of a single location in Plymouth, Michigan, but provides services both in and outside of Michigan.  Local 704 is a labor union that represents sprinkler fitters and apprentices in southeastern Michigan.  On February 1, 2006, Local 704 entered into a collective bargaining agreement (Exhibit A) with the National Fire Sprinklers Association, Inc. ("NFSA").  The NFSA is a multi-employer association that represents contractors in this industry.  At the time that Local 704 and the NFSA entered into the collective bargaining agreement, the Debtor was a member of the NFSA and, therefore, was bound to the agreement.  The agreement had a term of five years, which would expire on July 31, 2011.

-4-

On February 10, 2011, Penive, the president of the Debtor at that time, wrote to Local 704 (Exhibit 102) to inform it that the Debtor was withdrawing from the NFSA for purposes of multi-employer collective bargaining and that the Debtor desired to negotiate its own individual collective bargaining agreement with Local 704. Approximately one week after sending this letter, Penive contacted Robert Rutan, the financial secretary of Local 704 at that time, to start a dialogue for setting up negotiations for a new collective bargaining agreement after the current one expired on July 31, 2011. Penive informed Rutan that the Debtor was looking for relief from the current wage and benefit package for its sprinkler fitters. At that time, the total wage and fringe benefit package in effect was $61.92 per hour. Rutan explained to Penive that he understood that the Debtor had withdrawn from the NFSA and that it would like to negotiate directly with Local 704, but also stated that he did not know when Local 704 would be able to negotiate with the Debtor because it was very busy working on a new multi-employer agreement with the NFSA. Rutan also told Penive that no matter what else was negotiated, the Debtor's deal was not going to be any better than the deal NFSA was going to get under its new agreement because of the "favored nations" clause in the NFSA's multi-employer agreement.[1] After that conversation, there were a couple more conversations during spring 2011, but Local 704 continued to indicate that it did not have the time to negotiate with the Debtor because it was too busy with the NFSA negotiations. There were no

---

[1] Herman testified that this clause, also referred to in the industry as a "me too" or "equal treatment" clause, states that if Local 704 negotiates an agreement with any employer that provides more favorable employer conditions than set forth in the NFSA's agreement, the NFSA's multi-employer agreement shall be changed to incorporate the more favorable employer conditions should the NFSA so desire.

further communications between the Debtor and Local 704 before the existing collective bargaining agreement expired on July 31, 2011.

When the agreement expired, Local 704 went on strike, both against the contractors represented by the NFSA and those not represented by the NFSA, including the Debtor. At that time, Local 704 represented 19 sprinkler fitters employed by the Debtor, all of whom went on strike.

On August 2, 2011, Rutan sent by facsimile (Exhibit 103) a proposed interim agreement to all contractors not represented by the NFSA, including the Debtor. Local 704 offered in the interim agreement to return to work pending a final agreement between Local 704 and the NFSA, upon the same terms as existed in the expired collective bargaining agreement, plus a $2.00 per hour increase in wages. The Debtor notified Local 704 that it would not sign the interim agreement. Penive also wrote to Rutan on August 2, 2011 (Exhibit 104) to request a meeting with Local 704 to negotiate a new agreement between the Debtor and Local 704. Local 704 did not agree to meet because its "top priority" was trying to enter into a new multi-employer agreement with the NFSA. At that time, Local 704 and the NFSA were very far apart. According to Herman, Local 704's "bottom line" bargaining position with the NFSA was $61.92 per hour, the same total amount of the wage and fringe benefit package under the expired collective bargaining agreement. The NFSA's proposal to Local 704 called for a $21.00 per hour reduction from the previous collective bargaining agreement. Local 704's website (Exhibit 117) described the NFSA's proposal as "ridiculous" and a "kamikaze program."

On August 11, 2011, Penive sent another letter to Local 704 (Exhibit 105) to again request a meeting to negotiate a new agreement with Local 704. This letter stated that the Debtor wished to negotiate as soon as possible and pointed out that there was a picket line in front of the Debtor's

-6-

office at that time. Penive followed up with telephone calls to Rutan. Local 704 did not reply to the letter and did not meet with the Debtor.

On August 18, 2011, the Debtor filed a voluntary petition for relief under Chapter 11.

The strike was disruptive to the Debtor's business because it had commitments on projects that were now falling behind, but no active work force to complete those projects. Without replacement workers, the Debtor could not continue to maintain field operations, so the Debtor filled some of the vacated positions. The Debtor hired nine replacement workers after the strike began, eight between August 15, 2011 and September 12, 2011, and the last on October 31, 2011. One replacement worker, Michael J. Lister, had previously been employed by the Debtor before the strike. In hiring the replacements, the Debtor did not ask them about their union membership or sympathies. All of the replacement workers hired between August 15 and September 12, 2011 were hired as permanent replacements, except for Lister, whose status as permanent or temporary is not clear from the record. The Debtor told each of the permanent replacements that they were replacing a striking employee, that they were permanent employees, and that even if an agreement was made with Local 704, they would still have employment with the Debtor. The seven permanent replacements each signed an "Acknowledgment" that they were hired as a "permanent replacement worker" for a Local 704 striking employee (Exhibit 118), although it also stated that their employment was "at will" and could be terminated by the Debtor at any time with or without cause. Lister did not sign an "Acknowledgment."[2] The Debtor also hired a temporary replacement worker on October 31, 2011. He signed an "Acknowledgment" (Exhibit 118), which stated that he was a

---

[2] Lister quit his employment with the Debtor on October 13, 2011 and went to work for Penive, who had left his position with the Debtor by that date.

-7-

"temporary replacement." Although the Debtor did not expressly inform Local 704 that it had hired permanent replacement workers, the Debtor did not take any action to conceal this fact from Local 704.

Meanwhile, on September 1, 2011, Herman took over the position of business manager of Local 704. Herman had previously served as the business agent for Local 704, a member of its negotiating committee, and a trustee for certain of its funds. On September 15, 2011, Herman wrote to the Debtor (Exhibit 106) to advise that Local 704 "is hereby making an unconditional offer to return to work, effective immediately." Herman sent the same letter to the NFSA and to any contractor that had not signed an interim agreement. The NFSA's response was to lock out Local 704 because of the economic reductions that the NFSA was seeking. The Debtor and four other contractors also locked out Local 704 for the same reason. On September 16, 2011, Robert J. Finkel, a labor attorney for the Debtor, wrote to Herman in response to his September 15, 2011 letter. Finkel's letter (Exhibit 107) advised Herman that the Debtor "for solely economic reasons, is effectuating a lockout of Local 704 bargaining unit members effective immediately for the purpose of attempting to reach agreement on a new labor contract."

On September 20, 2011, Herman wrote to the Debtor. This letter (Exhibit 108) demanded that the Debtor "immediately end the lockout and accept the Union's unconditional offer to return to work." The second paragraph of the letter read as follows:

> As soon as you have accepted the Union's unconditional offer to return to work, we will be ready to schedule contract negotiations. In the meantime, provided you accept the Union's unconditional offer to return to work, the Union is willing to agree that it will not engage in a strike.

-8-

On September 21, 2011, Finkel wrote back to Herman on behalf of the Debtor. This letter (Exhibit 109) reiterated that the Debtor remained ready and willing to bargain with Local 704 and then made the following offer:

> In terms of an initial proposal, TriStar is seeking economic relief in the amount of $36.00 per hour which it needs to become competitive with its non-union competitors. It is exceedingly flexible as to how these savings can be achieved.

The $36.00 per hour figure reflected an aggregate reduction in the wage and fringe benefit package from the $61.92 per hour total under the previous collective bargaining agreement. It also reflected an amount that was, according to Weiber, "essentially close" to what the Debtor was paying its replacement workers. At the time that the Debtor sent this letter, the NFSA had not changed its request for a $21.00 per hour reduction in the total wage and fringe benefit package from Local 704. Local 704's "bottom line" with the NFSA at this time was still no wage and fringe benefit reduction of the $61.92 per hour figure under the previous collective bargaining agreement.

Local 704 did not respond to Finkel's September 21, 2011 letter either verbally or in writing for over two months because Herman was "incredibly busy." On November 29, 2011, Herman sent a two-page facsimile (Exhibit 110) to Finkel. The first page is a cover sheet. The second page is a letter that began by acknowledging that Local 704 "has been preoccupied with NFSA negotiations," but has "always been willing to meet with" the Debtor regarding a new collective bargaining agreement. The second and last paragraph of the letter read as follows:

> However, whether we bargain or reach an agreement is separate and independent of Tristar's obligation to return to work its employees who have made an unconditional offer to return. Whether or not we are able to reach agreement on a new Collective Bargaining Agreement, Tristar's continuing lockout of its employees for engaging in concerted protected activity was and is illegal. We will, therefore, be filing charges with the National Labor Relations Board in order to seek justice for these employees.

The following day, Local 704 filed an unfair labor practice charge (Exhibit C) with the National Labor Relations Board ("NLRB"). However, it later withdrew that charge.[3]

On December 2, 2011, Wieber sent a facsimile to Herman (Exhibit 111), which contained a proposed "shutdown agreement" (Exhibit 112) and requested a meeting with Herman on December 7, 2011. The facsimile specified both the time and the location of the meeting, but also requested that Herman "confirm your availability." Herman did not respond to this facsimile, either in writing or otherwise, because he was "working on something else at the time" and "completely forgot" to reply. Not hearing anything from Herman, Wieber nevertheless showed up for the meeting at the appointed time and place. Herman did not.

On December 8, 2011, Wieber again wrote to Local 704 (Exhibit 113) stating that the Debtor still wanted to meet with Local 704 and requesting that Herman contact him to arrange a mutually acceptable time and date for a meeting. Local 704 did not reply to this letter.

After the originally scheduled confirmation hearing on December 9, 2011, Local 704 sent the Debtor a breakdown (Exhibit 114) of wages and fringe benefits that showed a total package of $61.92, the same total amount as existed under the previous collective bargaining agreement, albeit with a different allocation.[4] The Debtor construed this breakdown as an offer. On December 18, 2011, Wieber wrote back to Herman (Exhibit 115) to acknowledge receipt of the "offer" of December 15, 2011, stating that it "does not meet our needs" and requesting a meeting to negotiate

---

[3] The date that the charge was withdrawn is not in the record, nor is there an explanation as to why it was withdrawn.

[4] Herman testified that it was sent by "mistake" to the Debtor but Herman did not testify that he ever told the Debtor that this was a "mistake."

-10-

with Local 704 at a mutually convenient time and place. Local 704 did not reply to this letter. Local 704 and the Debtor have never met to negotiate a new collective bargaining agreement.

At the time of the confirmation hearing, the Debtor continued to employ six of the nine replacement workers for the members of Local 704 that had gone out on strike and that were subsequently locked out. Five of those replacement workers are among the permanent replacement workers that were hired after Local 704 went on strike and before the Debtor implemented the lockout. The other permanent replacement workers hired by the Debtor after the strike but before the lockout are no longer working for the Debtor. The one temporary replacement worker hired by the Debtor after the lockout began continues to work for the Debtor.

On December 20, 2011, Local 704 refiled an unfair labor practice charge against the Debtor (Exhibit D) with the NLRB, stating that "[s]ince September 16, 2011 and continuing to date, the Employer has unlawfully locked out, refused to reinstate and/or rehire, and otherwise coerced and discriminated against its Local 704 member employees for engaging in concerted protected activity." Local 704 has not filed an unfair labor practice charge against the NFSA or any of the other contractors that locked out Local 704 after its "unconditional offer" to return to work. There is still no agreement between Local 704 and the NFSA. Local 704 and the NFSA remain $21.00 per hour apart, a much smaller gap than the $36.00 per hour reduction proposed by the Debtor.

<u>ANALYSIS</u>

1. <u>Local 704's motion</u>

Local 704's motion is brought under § 503(b) of the Bankruptcy Code. Section 503 is entitled "Allowance of Administrative Expenses." Section 503(a) provides that "[a]n entity may timely file a request for payment of an administrative expense . . . ." 11 U.S.C. § 503(a).

-11-

Section 503(b) provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . ." "Administrative expense" is not defined in the Bankruptcy Code. Instead, § 503(b) contains nine separate subparagraphs, each describing a category of claims entitled to administrative expense priority under § 503(b).[5] These nine categories are expressly made non-exclusive.

Local 704 asserts that its claim[6] is within the specific category of administrative expenses allowable under § 503(b)(1)(A), which reads in part as follows:

(A)    the actual, necessary costs and expenses of preserving the estate including—

    (i)    wages, salaries, and commissions for services rendered after the commencement of the case; and

    (ii)    wages and benefits awarded pursuant to a judicial proceeding or a proceeding of the National Labor Relations Board as back pay attributable to any period of time occurring after commencement of the case under this title, as a result of a violation of Federal or State law by the debtor, without regard to the time of the occurrence of unlawful conduct on which such award is based or to whether any services were rendered, if the court determines that payment of wages and benefits by reason of the operation of this clause will not substantially increase the probability of layoff or termination of current employees, or of nonpayment of domestic support obligations, during the case under this title . . . .

Local 704 does not contend that any of its members actually "rendered" any services to the Debtor post-petition, so there is no basis to allow an administrative expense claim to Local 704 under § 503(b)(1)(A)(i). However, § 503(b)(1)(A)(ii), in contrast to § 503(b)(1)(A)(i), does not

_____

[5] Administrative expense claims allowed under § 503(b) are entitled to priority under § 507(a)(2) of the Bankruptcy Code.

[6] "Claim" is defined in § 101(5)(A) of the Bankruptcy Code as including a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ."

-12-

require that any services actually be rendered after the commencement of the case in order to support the allowance of an administrative expense claim. This subsection, which was added to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, allows an administrative expense priority for "wages and benefits . . . awarded as back pay."[7] But this new subsection has a number of specific requirements, two of which are critical to Local 704's motion. First, the wages and benefits must be "awarded pursuant to a judicial proceeding or a proceeding of the National Labor Relations Board." Second, such award must be made "as a result of a violation of Federal or State law by the debtor."

In this case, no award to Local 704 has been made in any "judicial proceeding or a proceeding of the National Labor Relations Board." Although Local 704 filed an unfair labor practice charge with the NLRB on December 20, 2011, no award has been made in that proceeding. The only other "judicial proceeding" that Local 704 has identified is the bankruptcy case pending before this Court. At least until now, this Court has made no award of any wages and benefits as back pay. The Court knows of no reason why an award by this Court could not satisfy the "judicial proceeding" requirement of this subsection, *provided* that such award meets the second requirement, that it is made "as a result of a violation of Federal or State law by the debtor."

---

[7] There are some cases that have held that even this subsection requires that the claimant have "rendered services after the commencement of the case" because of the conjunctive "and" that appears between subparagraphs (i) and (ii). See Binford v. First Magnus Fin. Corp. (In re First Magnus Fin. Corp.), 403 B.R. 659, 665-66 (D. Ariz. 2009). However, the better reasoned cases examining this subsection hold that it is not a requirement that the claimant have actually "rendered services after the commencement of the case" under subparagraph (i) in order to qualify for an administrative expense claim under subparagraph (ii). See In re Philadelphia Newspapers, LLC, 433 B.R. 164, 170-75 (Bankr. E.D. Pa. 2010); In re Powermate Holding Corp., 394 B.R. 765, 771-74 (Bankr. D. Del. 2008).

-13-

Local 704's motion is predicated entirely upon a finding that the Debtor has engaged in post-petition unfair labor practices that violate the National Labor Relations Act. That is the only "violation of Federal or State law" cited by Local 704. Here is the problem that presents for Local 704. This Court does not have jurisdiction to determine whether the Debtor has engaged in an unfair labor practice that violates the National Labor Relations Act nor to make an award on account of such violation. Both Local 704 and the Debtor concede that only the NLRB has the jurisdiction to make such determination and award. Both parties cite controlling Sixth Circuit precedent holding that the NLRB "has been designated by Congress as the exclusive forum of original jurisdiction for adjudicating questions of representation or unfair labor practices in violation of the NLRA . . . ." Lexington Cartage Co. v Int'l Bhd. of Teamsters, 713 F.2d 194, 195 (6th Cir. 1983) (citation omitted). Because Local 704's motion does not seek an award of back pay based upon the Debtor's violation of any *other* "Federal or State law," the present proceeding before this Court cannot be the "judicial proceeding" required by § 503(b)(1)(A)(ii). Compare Binford v. First Magnus Fin. Corp. (In re First Magnus Financial Corp.), 403 B.R. 659 (D. Ariz. 2009) (addressing a claim for back pay for violation of the WARN Act). Therefore, since no award of wages and benefits for back pay has thus far been made either by the NLRB or in a "judicial proceeding," and because this Court lacks jurisdiction to make such award, Local 704 is not entitled, at least for now, to the allowance of an administrative expense claim under § 503(b)(1)(A)(ii) of the Bankruptcy Code.

Even if Local 704's claim does not qualify for allowance under § 503(b)(1)(A) or under any of the eight other non-exclusive categories of administrative expense claims contained in § 503(b)(2) through (9), Local 704 contends that it is still entitled to an allowed administrative expense claim

-14-

because the nine categories set forth in § 503(b) are expressly made non-exclusive, and the statute contemplates that there may be other claims that are entitled to allowance as administrative expense claims under § 503(b) of the Bankruptcy Code.

Because § 503(b) does not contain either a definition of administrative expense or an exclusive list of what constitutes an administrative expense, courts have developed various tests to determine whether a particular claim not expressly identified in one of the nine categories in § 503(b) may still be entitled to administrative expense priority under § 503(b). The Sixth Circuit Court of Appeals in Pension Benefit Guaranty Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.), 126 F.3d 811 (6th Cir. 1997), articulated a "benefit to the estate" test to determine whether a claim is entitled to priority as an administrative expense under § 503(b). Under this test, a debt is "an 'actual, necessary' administrative expense only if (1) it arose from a transaction with the bankruptcy estate and (2) directly and substantially benefitted the estate." Id. at 816 (citations omitted). "'The claimant has the burden of demonstrating entitlement to an administrative expense priority by a preponderance of the evidence.'" United Mine Workers of America 1974 Plan & Trust v. Lexington Coal Co. (In re HNRC Dissolution Co.), 396 B.R. 461, 475 (B.A.P. 6th Cir. 2008) (quoting In re Liberty Fibers Corp., 383 B.R. 713, 717 (Bankr. E.D. Tenn. 2008)).

Local 704 argues that it meets both components of the Sunarhauserman test. In the alternative, Local 704 argues that even if it does not meet the "benefit to the estate" test, it is still entitled to an allowed administrative expense claim under an exception recognized by the Supreme Court in Reading Co. v. Brown, 391 U.S. 471 (1968). Local 704 argues that Reading stands for the proposition that a claim may be afforded administrative expense priority even if it does not benefit

-15-

a debtor's estate, so long as the claim relates to the estate's post-petition operation of a business. In Reading, there was a fire at the debtor's eight-story industrial building post-petition. The owner of an adjoining property filed a claim against the estate for loss caused by the fire, asserting that the fire was the result of negligence of the receiver operating the debtor's business. Id. at 473-74. Ultimately, the Supreme Court held that the claim was an "actual and necessary cost" of operating the business, even though payment of the claim did not provide any benefit to the bankruptcy estate. Id. at 485. The fire loss claimant "did not merely suffer injury at the hands of an insolvent business: it had an insolvent business thrust upon it by operation of law." Id. at 478. The Supreme Court reasoned that the fire loss claimant should justly be entitled to share equally with those for whose benefit the business was carried on. Id. at 483-84.[8]

The Court need not consider how Local 704's claim fares under either Sunarhauserman or Reading because Local 704's request for allowance of an administrative expense claim under either of those cases runs straight into the same roadblock as its request under § 503(b)(1)(A). In order to consider whether Local 704's claim meets either the Sunarhauserman test or the Reading exception, the Court must still determine whether to allow Local 704's claim or, in other words, determine that it is enforceable against the Debtor at all. As noted earlier, Local 704's motion for allowance and payment of an administrative expense claim in this case is based entirely upon its assertion that the Debtor engaged in unfair labor practices in violation of the National Labor

---

[8] In HNRC Dissolution Co., the Sixth Circuit Bankruptcy Appellate Panel observed that courts have limited Reading to claims arising out of post-petition misconduct by a debtor in possession or a trustee, and noted that the Sixth Circuit has granted administrative priority under Reading in only one instance. See 396 B.R. at 483 (discussing Lancaster v. Tenn. (In re Wall Tube & Metal Prods. Co.), 831 F.2d 118 (6th Cir. 1987)).

Relations Act post-petition. As explained above, the bankruptcy court simply does not have jurisdiction to make that determination. Only the NLRB can make such determination. Local 704 filed an unfair labor practice charge against the Debtor with the NLRB on December 20, 2011. The NLRB has not ruled on Local 704's charge. Unless and until the NLRB adjudicates the unfair labor practice charge, and makes an award in favor of Local 704, this Court cannot find that Local 704 has an enforceable claim against the Debtor. Therefore, Local 704 is not entitled at this time to allowance of an administrative expense priority claim in this bankruptcy case, regardless of whether Local 704 seeks such allowance under § 503(b)(1)(A), Sunarhauserman or Reading. To the extent that Local 704's motion seeks allowance and payment of an administrative expense claim, the Court holds that it must be denied.

## 2. Local 704's objection to confirmation

Local 704 and the Debtor agree that the NLRB proceeding to adjudicate Local 704's unfair labor practice charge may take months or even years. Waiting until the NLRB concludes its proceeding may be satisfactory to Local 704, but not to the Debtor, if it means the Debtor must wait to seek confirmation of its plan of reorganization. The Debtor wants to move forward with confirmation now. But if the Debtor is going to move forward and seek confirmation before the NLRB proceeding is finished, Local 704 argues that even if the Court cannot *allow* it an administrative expense claim at this time, the Court should at least find that it holds an administrative expense claim for purposes of considering its objection to confirmation.

Local 704's objection raises a number of issues. Not all of them are presently before the Court. But Local 704's assertion of an administrative expense claim by Local 704 does directly implicate at least two requirements that the Debtor must meet to confirm its plan under § 1129 of

-17-

the Bankruptcy Code. First, if Local 704 is entitled to an administrative expense claim, § 1129(a)(9)(A) requires that, on the effective date of the Debtor's plan, Local 704 receive cash equal to the allowed amount of the claim unless Local 704 agrees to some different treatment. Thus far, Local 704 has not said that it would agree to any different treatment for its alleged administrative expense claim. Second, the Debtor's plan may only be confirmed if the Court makes a finding of feasibility. This requirement is found in § 1129(a)(11). The Court must find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). "Feasibility is a mandatory requirement for confirmation." In re Made in Detroit, Inc., 299 B.R. 170, 175 (Bankr. E.D. Mich. 2003). "[A] bankruptcy court cannot adequately determine a plan's feasibility for purposes of section 1129(a)(11) without evaluating whether a potential future judgment may affect the debtor's ability to implement its plan." Sherman v. Harbin (In re Harbin), 486 F.3d 510, 518 (9th Cir. 2007) (citation omitted). "A bankruptcy court's failure to consider such a possibility in discharging its duties under section 1129(a)(11) is clear error." Id. (citation omitted).

In order to determine whether the Debtor's plan meets the confirmation requirements of § 1129(a)(9) and (11), the Court must make some judgment call about whether the completion of the pending NLRB proceeding will result in Local 704 holding an allowed administrative expense claim against the Debtor and, if so, in what amount. Further, based on that judgment call, the Court must also make an assessment about whether the NLRB's determination will require either liquidation or the need for further financial reorganization of the Debtor.

At the original confirmation hearing, the Court inquired of counsel for Local 704 and counsel for the Debtor whether the proper way to handle the dispute between them would be to make an estimate of the administrative expense claim sought by Local 704. By the time of the evidentiary hearing on February 8, 2012, both parties agreed that the Court can and should estimate Local 704's administrative expense claim both for purposes of its motion and for purposes of considering its objection to confirmation of the Debtor's plan. However, because this Court indisputably does not have jurisdiction to adjudicate whether there has been an unfair labor practice, it is important to understand what authority, if any, exists to support this Court making an estimate with respect to the administrative expense claim asserted by Local 704.

There are at least two sections of the Bankruptcy Code that arguably empower the Court to estimate Local 704's claim. One of them is § 502(c) of the Bankruptcy Code. That section expressly states that "[t]here shall be estimated for purpose of allowance under this section— (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . . ." This provision makes it clear that the bankruptcy court has the power to estimate claims for purposes of allowance under § 502 of the Bankruptcy Code. The trouble with using § 502(c) here is that the statute does not expressly state that this power extends to the estimating of claims for purposes of allowance as administrative expenses under § 503 of the Bankruptcy Code. There is no counterpart to § 502(c) contained within § 503. Moreover, there are a number of distinctions between the provisions governing allowance of claims under § 502 and the provisions governing allowance of administrative expenses under § 503. See In re Plastech Engineered Products, Inc., 394 B.R. 147, 155-60 (Bankr. E.D. Mich. 2008) (explaining generally the differences between claim allowance under § 502 and administrative expense allowance under

-19-

§ 503).  In this case, neither Local 704 nor the Debtor argue that the Court may not use § 502(c) for purposes of estimating Local 704's administrative expense claim, but they do not provide the Court with any authority to support their position that § 502(c) can be used to estimate administrative expense claims for purposes of allowance under § 503.

A second possible source of authority for the Court to estimate an administrative expense claim is § 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." "Although § 105(a) permits a bankruptcy court to use its equity powers . . . , '[these powers] may only be used in furtherance of the goals of the Code.'"  Miller v. Pennsylvania Higher Education Assistance Agency (In re Miller), 377 F.3d 616, 621 (6th Cir. 2004) (quoting Childress v. Middleton Arms, L.P. (In re Middleton Arms, Ltd. Partnership), 934 F.2d 723, 725 (6th Cir.1991)).  "As the Supreme Court has recognized, 'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.'"  Id. (quoting Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988)).  Section 105(a) has been used to carry out the provisions of Chapter 11, including § 1129.  See, e.g., Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 656-57 (6th Cir. 2002) (finding that § 105(a) permits a plan to be confirmed under certain circumstances even if the plan "enjoin[s] a non-consenting creditor's claim against a non-debtor"); Airadigm Communications, Inc. v. F.C.C. (In re Airadigm Communications, Inc.), 519 F.3d 640, 657 (7th Cir. 2008) (holding that § 105(a) provides authority for a Chapter 11 plan to "release third parties from liability to participating creditors").  Section 105(a) arguably provides sufficient authority to estimate Local 704's administrative expense claim, but it is unnecessary for the Court to employ it because there is a more

-20-

specific grant of authority to estimate this claim that comes from outside of the Bankruptcy Code.

Section 157 of Title 28 is entitled "Procedures." It authorizes bankruptcy judges to hear and determine all core proceedings arising under Title 11 and then goes on to identify certain specific proceedings as core proceedings. One of those proceedings is § 157(b)(2)(B), which expressly grants the bankruptcy court the authority to estimate claims for purposes of confirming a plan in Chapter 11.

> Core proceedings include, but are not limited to . . . allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 . . . .

This provision authorizes a bankruptcy court to estimate claims not just for purposes of allowance of such claims. The authority conferred by this statute expressly extends to the "estimation of claims . . . for the purposes of confirming a plan under chapter 11 . . . ." This statute provides the strongest and most unambiguous authority for this Court to estimate Local 704's administrative expense claim for purposes of considering confirmation of the Debtor's plan. See In re Harbin, 486 F.3d at 519 ("Congress has explicitly given the bankruptcy court jurisdiction to consider questions concerning confirmation of a debtor's plan, and in doing so to estimate the various claims and interests against the debtor's estate."); N.L.R.B. v. Greyhound Lines, Inc. (In re Eagle Bus Mfg., Inc.), 158 B.R. 421, 435-38 (S.D. Tex. 1993) (affirming bankruptcy court's estimation, for purposes of confirmation, of the NLRB's unfair labor practice claim stemming from the debtor's refusal to reinstate striking workers after an unconditional offer to return to work).

Because of the NLRB's exclusive jurisdiction over unfair labor practices, the Court cannot adjudicate that there has been an unfair labor practice by the Debtor for purposes of *allowing*

-21-

Local 704 an administrative expense claim. However, the Court holds that it is authorized by 28 U.S.C. § 157(b)(2)(B), without any need to resort to §§ 105 and 502(c) of the Bankruptcy Code, to make an *estimate* of the likelihood of Local 704's administrative expense claim for purposes of considering its objection to the Debtor's plan. Without the ability to estimate the likelihood of success of Local 704's unfair labor practice charge before the NLRB, and the amount that may be awarded on such claim, this Court would be hamstrung to perform its statutory responsibilities under § 1129 of the Bankruptcy Code to determine whether or not all of the elements of confirmation have been met. The only alternative would be to indefinitely delay the Debtor's request for confirmation of its plan of reorganization until the NLRB makes its determination. That would cause an undue delay in the administration of this case. That is not a result that the Bankruptcy Code requires or permits. Therefore, the Court will estimate Local 704's asserted claim for unfair labor practices, based upon the evidence in the record before this Court.

3. Estimating Local 704's claim for unfair labor practices

Estimating Local 704's claim for purposes of considering its objection to confirmation necessarily involves some review of the National Labor Relations Act and the cases construing it. The starting point is Section 7 of the NLRA, (29 U.S.C. § 157), which preserves the rights of employees to organize, collectively bargain, and "engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."

Section 8 of the Act, (29 U.S.C. § 158(a)), describes unfair labor practices of employers. At issue in this case are subsections (1) and (3):

It shall be an unfair labor practice for an employer –

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title . . .

. . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

The right to strike is preserved in 29 U.S.C. § 163:  "Nothing in this subchapter, except as specifically provided herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right."

"The basic procedure to evaluate whether a company has engaged in an unfair labor practice was first outlined by the Supreme Court in N.L.R.B. v. Great Dane Trailers, Inc." Local 15, Int'l Bhd. of Elec. Workers v. N.L.R.B., 429 F.3d 651, 656 (7th Cir. 2005) (citing N.L.R.B. v. Great Dane Trailers, Inc., 388 U.S. 26 (1967)).  "The first question in the Great Dane framework is whether the employer's conduct is 'inherently destructive of important employee rights.'  Actions that harm the collective bargaining process, interfere with the employees' right to strike, or are taken against employees based upon union status are 'inherently destructive.'" Id. (quoting Great Dane Trailers, 388 U.S. at 34) (other citation omitted) (going on to describe the "comparatively slight" harm prong of the Great Dane framework).  "[O]nce it has been established that the employer's conduct negatively affects protected section 7 rights, the key question . . . is whether the employer can state a business justification for its actions." Id.

In this case, Local 704 asserts that the Debtor's lockout was unlawful.  "Although the NLRA does not define the term 'lockout,' it is generally taken to refer to the withholding of employment by an employer from its employees for the purpose of either resisting their demands or gaining a concession from them." Dayton Newspapers, Inc. v. N.L.R.B., 402 F.3d 651, 664 (6th Cir. 2005)

-23-

(internal quotation marks and citation omitted). "If an employer can show no legitimate and substantial business justification, the lockout is presumptively an unfair labor practice under either prong of the Great Dane analysis." Local 15, I.B.E.W. v N.L.R.B., 429 F.3d at 656.

"In some situations, 'legitimate and substantial business justifications' for refusing to reinstate striking employees who engaged in an economic strike, have been recognized." N.L.R.B. v. Fleetwood Trailer Co., 398 U.S. 375, 379 (1967) (citing in part N.L.R.B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345-46 (1938)) (other citations omitted). "One [situation] is when the jobs claimed by the strikers are occupied by workers hired as permanent replacements during the strike in order to continue operations." Id. (citations omitted).

"An employer [also] may lawfully lock out employees . . . to pressure the Union to accept the employer's legitimate bargaining position, as long as the employer conducts the lockout in a manner 'reasonably adapted to achieve legitimate business ends or to deal with business exigencies . . . ." Dayton Newspapers, Inc. v. N.L.R.B., 402 F.3d at 662 (quoting N.L.R.B. v. Brown Food Store, 380 U.S. 278, 287-88 (1965)) (other citations omitted). "To be reasonably adapted to achieve legitimate business ends, the employer's conduct throughout the lockout must be consistent with the advancement of its legitimate bargaining position so that the employees are able to knowingly reevaluate their position." Id. (internal quotation marks and citation omitted). "The employees must know at any point in the lockout what they can do to end it." Id. "[A] striking worker does not have to be recalled to an opening for which he or she is qualified unless that vacancy is created by the departure of replacements from the striker's former job." Id. at 665 (citation omitted). See also Belknap, Inc. v. Hale, 463 U.S. 491, 493 (1983) (finding that "[w]here the employees have engaged in an economic strike, the employer may hire permanent replacements

-24-

whom it need not discharge even if the strikers offer to return to work unconditionally," in contrast to a strike to protest unfair labor practices, in which case "the employer must discharge any replacements in order to accommodate returning strikers").

"An employer violates NLRA § 8(a)(3) and (1) if it fails to reinstate striking workers without showing a legitimate and substantial business justification." Dayton Newspapers, 402 F.3d at 662 (citing N.L.R.B. v. Fleetwood Trailer Co., 389 U.S. at 378). "[T]he Act is [also] violated if an independent unlawful purpose motivated the hiring of permanent replacements." New England Health Care Employees Union v. N.L.R.B., 448 F.3d 189, 192 (2d Cir. 2006) (internal quotation marks and citation omitted).

"If, after the conclusion of the strike, the employer refuses to reinstate striking employees, the effect is to discourage employees from exercising their [guaranteed] rights to organize and to strike . . . ." N.L.R.B. v. Fleetwood Trailer Co., 389 U.S. at 378. "Under §§ 8(a)(1) and (3) (29 U.S.C. §§ 158(1) and 3)) it is an unfair labor practice to interfere with the exercise of these rights. Accordingly, unless the employer who refuses to reinstate strikers can show that his action was due to 'legitimate and substantial business justifications,' he is guilty of an unfair labor practice." Id. (quoting N.L.R.B. v. Great Dane Trailers, 388 U.S. at 34). "The burden of proving justification is on the employer." Id. This is because "'proof of motivation is most accessible to [the employer].'" Local 15, I.B.E.W. v. N.L.R.B., 429 F.3d at 657 (quoting Great Dane Trailers, 388 U.S. at 34).

Here, Local 704 argues that the lockout was unlawful for several reasons, which can be distilled into four basic arguments. The framework for understanding these arguments starts with the premise that the "use of the lockout does not carry with it any necessary implication that the

-25-

employer acted to discourage union membership or otherwise discriminate against union members as such." American Ship Building Co. v. N.L.R.B., 380 U.S. 300, 312 (1965). Lockouts are permitted in the "wide range of employer actions taken to serve legitimate business interests in some significant fashion, even though the act committed may tend to discourage union membership." Id. at 311.

First, Local 704 argues that the Debtor did not have a legitimate and substantial business justification for the lockout. The evidence does not support this argument. Instead, the evidence demonstrates that the Debtor hired permanent replacement workers after the strike but before the lockout because the Debtor was in danger of shutting down and needed replacement workers to continue its field operations. The evidence also demonstrates that at the end of the strike, all of the positions that the Debtor needed were filled. There were no openings. There is no contrary evidence in the record. Hiring permanent replacement workers during a strike is lawful, as is refusing to reinstate striking workers at the end of a strike when the workers' jobs are "occupied by workers hired as permanent replacements during the strike in order to continue operations." N.L.R.B. v. Fleetwood Trailer Co., 398 U.S. at 379. The NLRB would likely find that the Debtor's hiring of permanent replacement workers to fill the striking workers' positions provided a legitimate and substantial business justification for the lockout.

Second, Local 704 argues that the Debtor's lockout was illegal because the Debtor improperly used the lockout to assert its bargaining position but without informing Local 704 of its economic position. The evidence does not support this assertion either. The Debtor had consistently and repeatedly informed Local 704, since back in February 2011, that it needed economic relief from the wage and fringe benefit package for the sprinkler fitters. The evidence shows that multiple

-26-

letters were sent and multiple telephone calls were made by the Debtor to Local 704 from that time, through the strike, through the lockout and after, conveying the need for economic relief and the amount of relief that the Debtor was requesting. The evidence demonstrates that Local 704 was aware that the Debtor had filed a Chapter 11 petition on August 18, 2011. The evidence also demonstrates that Local 704 had made it clear to the Debtor that the Debtor would not get a better deal than the NFSA and, in any event, Local 704 would not even bargain with the Debtor until after it had reached an agreement with the NFSA. When Local 704 wrote on September 20, 2011 (Exhibit 108) demanding an end to the lockout and making an "unconditional offer to return to work," the evidence shows that Local 704 was still at least $21.00 per hour apart from the NFSA in its position regarding the total wage and fringe benefit package for its members. The following day, when the Debtor wrote back to Local 704 on September 21, 2011 (Exhibit 109), the Debtor unequivocally indicated that it needed economic relief from Local 704, consisting of a total reduction in the wage and fringe benefit package of $36.00 per hour.

There is absolutely no evidence in the record to indicate in any respect that Local 704 and its members somehow did not understand the Debtor's demands and the conditions that Local 704 had to agree to in order to obtain reinstatement. The Debtor's total requested reduction was clear and precise. The Debtor expressly stated that it was flexible in how that reduction could be implemented, but Local 704 unquestionably knew what it had to agree to in order to obtain reinstatement. Although Local 704 now suggests that a proposed $36.00 per hour reduction was somehow "incomplete" because there are many other specific terms and provisions that go into a collective bargaining agreement, there is no evidence in the record from which the Court could find that Local 704 somehow did not know what the Debtor was seeking or was confused by its proposal.

-27-

In the circumstances of this case, the $36.00 per hour reduction proposed by the Debtor's September 21, 2011 letter (Exhibit 109), one day after Local 704's "unconditional offer" to return to work, was sufficiently timely and complete.  Compare Alden Leeds, Inc., 357 N.L.R.B. No. 20, 2011 WL 2883219, at *18-*21 (July 19, 2011) (finding that the employer's email on the eve of contract expiration "was confusing, incomplete, and internally inconsistent," contrary to the position taken during negotiations, admittedly "did not represent an accurate or complete proposal," "and fail[ed] to provide the Union and [ ] employees with the timely and complete notification of the terms that the employees must accept to avert the lockout"; and concluding that "by locking out its employees without providing its employees a timely, clear, and complete set of conditions that the employees must accept in order to avert the lockout, [the employer] has violated Section 8(a)(1) and (3) of the Act").

        Far from showing confusion by Local 704 over the Debtor's economic position, the evidence in the record overwhelmingly shows that Local 704 clearly understood the Debtor's position, but just did not like it.  The Debtor's proposed $36.00 per hour reduction was significantly greater than the NFSA's requested reduction and was indisputably very far apart from Local 704's "bottom line" position of continuing at the pre-strike $61.92.  If Local 704 considered the NFSA's requested reduction of $21.00 per hour to be "ridiculous," then the $36.00 per hour reduction requested by the Debtor must necessarily have been even more unacceptable to Local 704.  Herman's testimony unequivocally demonstrates that the $36.00 per hour reduction was wholly unacceptable to Local 704.  That was Local 704's problem with the offer, rather than some lack of clarity about the offer.  Based upon the evidence in this record, the Court concludes that it is not likely that the NLRB

will find that the Debtor conducted the lockout in a manner that was inconsistent with its legitimate bargaining position or prevented Local 704 from being able to knowingly reevaluate its position.

Third, Local 704 argues that, even if the Debtor had a substantial and legitimate business reason for the lockout, there is evidence of other violations of the NLRA, each sufficient to overcome the business justification and demonstrate that the lockout was motivated by anti-union considerations, rendering what might have been a legal lockout illegal. Local 704 contends that the Debtor concealed its hiring of permanent replacement workers, and this shows an unlawful purpose in locking out the striking employees. It is true that an employer's efforts to keep its decision to hire permanent replacement secret may be probative of an unlawful purpose. See New England Health Care Employees Union v. N.L.R.B., 448 F.3d at 194-96. But there is no evidence in this record that the Debtor in any way concealed or even tried to hide the fact that it hired permanent replacement workers during the strike.

At best, Local 704 points to the absence of any evidence to show that the Debtor took some affirmative step to inform Local 704 that it had hired permanent replacement workers during the strike. This fact does not help Local 704 for two reasons. First, Local 704 has not cited the Court to any authority requiring the Debtor to affirmatively announce the hiring of permanent replacement workers. Second, the evidence establishes that Local 704 was "too busy" to communicate with the Debtor and was entirely unresponsive to the Debtor's letters, telephone calls and other communications. The inference is strong that had Local 704 been even minimally responsive, it would have learned that the Debtor had hired permanent replacement workers. If anything, the evidence in the record suggests that Local 704 may actually have known about the hiring of permanent replacement workers because it was continuing to picket the Debtor's business premises

-29-

and monitor its operations. In any event, there is no evidence in the record from which the Court could find that the Debtor concealed its hiring of permanent replacement workers and then infer from such fact that the lockout was in any way in retaliation for the strike or in any way undertaken for some improper purpose. Compare New England Health Care Employees Union v. N.L.R.B., 448 F.3d at 190, 194-96 (finding that the employer "made a conscious decision to tell the Union nothing about the hiring of permanent replacements, and took active measures to keep the replacement campaign a secret while hiring as many permanent replacements as it could before the Union caught on," and noting that the employer described the plan as a "well-executed surprise event" that had "[the Union] in a real bind," and informed a temp agency that "its plans regarding permanent replacements were to be kept 'hush-hush'"). Based upon the evidence in this record, the Court concludes that it is not likely that the NLRB will find that the Debtor concealed the hiring of permanent replacement workers or that any alleged concealment evidences an improper motive.

Fourth, Local 704 argues that the lockout was discriminatory because the Debtor did not lockout Lister. Local 704's argument here is not entirely clear to the Court, and somewhat evolved during the hearing. Initially, Local 704 alleged that "a number" of strikers crossed over and returned to work with the Debtor. But when the evidence showed that only one employee, Lister, crossed over, Local 704 appeared to argue that, at the end of the strike, the Debtor locked out only those employees who remained on strike, and did not lockout Lister. According to Local 704, this means that the Debtor discriminated against only those employees who had exercised their Section 7 right to strike. The evidence does not support Local 704's contention that the lockout was discriminatory.

A partial lockout may be legal if it is justified by a legitimate and substantial business justification, such as operational needs or as a means to pressure strikers to abandon their bargaining

position.  See Local 15, I.B.E.W. v. N.L.R.B., 429 F.3d 651, 657-58 (7th Cir. 2005).  If some employees are necessary for continued operations and others are not, an employer may be justified in locking out only the unnecessary employees.  Id.  That is what the record shows happened here. During the strike, before the lockout, the Debtor filled those positions that were necessary to the continued operations, with permanent replacement workers receiving a substantially reduced wage and fringe benefit package.  The evidence shows that the Debtor had reduced its operations and, at the time of the lockout, did not have the need to bring back any more employees.  After the lockout, the Debtor did not hire any more permanent replacement workers, but added only one temporary replacement worker when Lister quit.  This is not a case where the evidence demonstrates that "the crossovers and non-strikers were unnecessary to the continuation of the business operations."  Id. at 658.  Nor is there evidence that "the lockout was used in a retributive fashion to discourage employees from exercising their section 7 right to strike," or that the employer displayed an anti-union animus by acting only against the employees who participated in union activities.  Id. at 661. To the contrary, the evidence indisputably shows that the employees who were not locked out were all necessary to the Debtor's continued operations.  The evidence establishes that the lockout was justified by legitimate and substantial operational needs, which Local 704 has not overcome by evidence of an illegal motive.  Compare Dresser-Rand Co., 2010 WL 341549 (N.L.R.B. Jan. 29, 2010) (where the lockout included crossover employees, but not permanent replacements, finding that the employer had met its burden of demonstrating a substantial and legitimate business reason for the lockout, but that the general counsel had met its burden of demonstrating that the lockout was nevertheless motivated by anti-union considerations based on the employer's several violations of the NLRA, including preferential treatment of the crossovers by contacting them first when the

-31-

lockout ended and failing to apply seniority and performance ranking criteria to the crossovers that it applied to the returning strikers).  Based upon the evidence in this record, the Court holds that it is unlikely that the NLRB will find that the Debtor's lockout was discriminatory or that it was for an improper purpose.

### C<small>ONCLUSION</small>

This Court does not have jurisdiction to adjudicate whether the Debtor has committed an unfair labor practice.  As a result, the Court cannot *allow* Local 704 an administrative expense claim and its motion must be denied.  But the Court can and must evaluate the likelihood of success that Local 704 may have in prosecution of its unfair labor practice charge before the NLRB.  Based upon the evidentiary record made in this case, the Court concludes that the Debtor's oral motion for judgment that it made at the close of Local 704's proofs must be denied.  But the Court also concludes that Local 704 has not met its burden to prove that it is likely to be successful in proving its unfair labor practice charge before the NLRB.   Therefore, for purposes of considering Local 704's objection to confirmation of the Debtor's plan, the Court holds that Local 704's claim for an administrative expense in this Chapter 11 bankruptcy case must be estimated at zero.  This estimate is, of course, without prejudice to Local 704's right to prosecute the unfair labor practice charge that it has filed with the NLRB and without intrusion on the NLRB's exclusive jurisdiction to adjudicate such charge.  Because the Court estimates Local 704's administrative expense claim at zero, the Court also holds that Local 704's objection to confirmation of the Debtor's plan of reorganization must be overruled, to the extent that it is based upon § 1129(a)(9) and (11) of the Bankruptcy Code.  Those issues raised by Local 704's objection to confirmation that were not implicated by Local 704's motion for allowance and payment of an administrative expense claim

-32-

are preserved for the confirmation hearing. The Court will enter an order consistent with this opinion.[9]

.

**Signed on March 08, 2012**

                              ___/s/ Phillip J. Shefferly___
                              **Phillip J. Shefferly**
                              **United States Bankruptcy Judge**

---

[9] The Court has considered all of the evidence in the record made in this proceeding, and all of the arguments made by Local 704 and the Debtor in their respective briefs, even if they are not all specifically mentioned in this opinion.